### H. H. BECK v. SOUTHERN RAILWAY COMPANY.

(Filed 18 December, 1907).

1. **Railroads—Negligence—Crossings—Reasonably Safe Place—Employees.**

There was sufficient evidence to go to the jury upon the question of defendant's negligence in not providing a reasonably safe way, by a subway, overhead bridge or other appropriate method, for its employees who have to cross its tracks, forty in number, when they, numbering several hundred, were permitted by custom to pass daily for ten years over and back at certain places thereon, going to and from their work, and in such manner that serious accidents must necessarily occur.

2. **Same—Negligence—Crossings—Employees—Contributory Negligence.**

In crossing defendant's tracks in accordance with a permitted custom for ten years, the plaintiff's intestate found a string of dead cars, without engine, standing still on one of the tracks, the rear car being directly across his usual road home. Plaintiff's intestate, in attempting to pass between two cars attached by a chain, a distance of several feet apart, and in accordance with the established custom, was caught and injured by the sudden attachment, without lookouts, signals or warnings, of an engine, unseen by him, and in a manner in which he could not reasonably have anticipated: *Held*, (1) the negligence of the defendant was the proximate cause of the injury; (2) that, if the question of contributory negligence should arise upon the facts, it is one for the jury.

CONNOR, J., concurring *arguendo;* WALKER, J., concurring in concurring opinion. BROWN, J., dissenting *arguendo.*

CIVIL ACTION, tried before *Moore, J.,* and a jury, at February Term, 1907, of the Superior Court of ROWAN County.

The plaintiff sued to recover damages of defendant for the negligent killing of his intestate, who was an employee of defendant in the capacity of tool carrier in its machine shops at Spencer, N. C. Said intestate was a boy about sixteen years old, and worked for defendant, at night, in the capacity aforementioned. Defendant's shops and about forty tracks are between the two towns—Spencer and East Spencer—and several thousand people live on each side of these tracks, and

about 1,300 people work for defendant in its shops and on its yards. It was the custom for the people (with the knowledge and by permission of defendant) working for the defendant, and those living in said towns, to pass over these tracks at their pleasure and in the performance of their duties. Defendant provided two walkways, or crossings, over its tracks for said persons to cross, and for the past ten years permitted people to cross thereover in large numbers—several hundred per day; and when these crossings or openings were closed or blockaded by trains or cars, defendant permitted them to cross said tracks by climbing over, under or between cars, and this has been the custom since the shops were built, in 1896. Said intestate lived in East Spencer, and his usual and customary way home, together with all persons living in East Spencer, was to cross over these tracks. The night employees got off of duty about 7 o'clock A. M., and, if the tracks were blockaded with cars and the crossings were blockaded, intestate and others went to their homes by passing between, over and under cars across said openings or crossings. The morning in question, when said intestate was injured, a string of cars was standing on one of these tracks, known as the "lead track," and had been standing there for several hours, and to this string of cars other cars were attached by a chain, which left a space of several feet. The first car which was chained to the string of cars was one over one of said crossings, which made it necessary for the intestate—carrying out the usual custom— to pass under, between or over it, in order to go his usual way home. This string of cars did not have any engine attached to it, as it was standing still, and there was no watchman or sentinel at said crossing, or at any place on said cars or near there, to give warning or notice of the cars being put in motion; and, as said intestate was attempting to pass between the two cars that were chained together, without warning or signal, defendant caused one of its engines to be suddenly and violently shoved back against said cars and intestate to be

caught between them and injured and mashed, from which injuries he died. The car that was chained to the string of cars had no bumper or drawhead, so that when the string of cars was shoved back against it there was no space left between said cars where intestate was attempting to pass through.

At the close of the evidence the motion of defendant to dismiss was granted, and the plaintiff appealed.

*R. Lee Wright* and *P. S. Carlton* for plaintiff.
*T. C. Linn* for defendant.

CLARK, C. J. The plaintiff was entitled to have this cause submitted to a jury.

There are thirty to forty tracks in Spencer, which are almost continuously filled with cars, more or less. The railroad company has 1,300 operatives working in its shops and yards and living on both sides of the railroad, many of whom have to cross these tracks daily in going from their homes to their work, and returning. The defendant's operatives and their families and attendant population constitute several thousand people. These operatives and people, or many of them, have to cross these tracks, necessarily, very often. The witness, whose evidence must be taken as true in this motion, says that several hundred people cross these tracks daily, and for ten years the custom has always been to go through, under or between the cars, or over them, whenever the tracks are blocked. The defendant, knowing this fact, was guilty of gross negligence, in that it did not provide either a subway or overhead bridges, or, at least, lifting bars, with a guard at each passway. The latter course was ordered (*Brown, J.,* in *Hickory v. Railroad,* 143 N. C., 451) where there was only one track. Here there are forty. This is a necessary precaution, and, no precaution of any kind being provided, accidents such as this must necessarily occur.

It was also negligence, as this Court has over and again

declared, to attach the engine to this dead string of cars and suddenly run them backwards, without warning or signal or anyone on the rear of the train to give notice. *Ray v. Railroad,* 141 N. C., 84; *Hudson v. Railroad,* 142 N. C., 202. There being no bumper, or drawhead, when the plaintiff's intestate was caught between the cars by the sudden pushing back of the dead string of cars, he could not possibly escape.

This being a nonsuit, it is not necessary to set out all the testimony, but only so much as will show, "with the most favorable inferences which a jury would be authorized to draw from it," that there was enough evidence to entitle the plaintiff to his constitutional privilege of a trial by jury. The following are *verbatim* extracts from the testimony:

The plaintiff testified, in part: "There are two towns at Spencer—one on the east and one on the west side of the railroad tracks—and the shops are between the two towns. I worked at the shops. About 1,300 people are employed there. I guess four or five hundred of the employees live on the east side of the railroad tracks; about 800 live on the west side. The population of East Spencer is about 5,000. The custom of those who live on the east side of the railroad, in going to the shops, is to cross the tracks to get to the shops to work. There are between thirty and forty tracks there. I have seen people going to and coming from their work across these tracks in great numbers. I know about where Grubb was injured. There is an opening leading from the carpenters' shop as far as the shed goes. There is a plank walkway that leads to the carpenters' shop; it is used by people to walk across and to roll hand cars across the tracks. The opening runs north and south. If cars are on the tracks across this opening, people have to climb over, or under, or through, or go around the cars."

Lee Ketchie testified, in part: "I lived on the east side of the railroad during the three years and eleven months preceding 25 November, 1905. I had to cross the lower end of

freight yard, and also the shop yard, in order to get to my work. I know what the custom of the defendant's employees in going to and from their work was. This custom had existed ever since the shops were built, in the spring of 1896. The custom was to cross the freight yard and to go through, under or between the cars or over the top of them. As a general thing, people going from East to West Spencer go across the yard. This custom has prevailed since the shops were built. Several hundred people went backward and forward daily at the time the intestate was hurt, and before. The defendant's employees have to cross through, between the cars, or over them, to get to their work. My duties often required me to work in the yard; others were required to work in the yard. We had to go from the carpenter shop to the yard, down through the opening to the carpenter shop. There was another opening south of the opening to the carpenter shop; it led from the car shops across the other tracks. The tracks of the opening are laid the same distance apart as the railroad tracks. Both of these openings run east and west, through the sheds. The railroad tracks cross these openings and run north and south. When the openings are filled with cars or trains, the workmen go to their work by crossing under the cars or going over or between them. This is so, to a great extent. The crossings are constantly blocked, mornings and evenings and several times a day. They were usually blocked in the mornings, when we went to work. They were frequently blocked about quitting time in the afternoon. The men, to get to their homes, had to cross the line of cars or go a considerable distance around them. Those who went home to dinner had to cross these tracks and go out across the freight yard. People could not have gone around and gotten their dinners and gotten back in time to work. I have seen the foremen crawl through cars, and under cars, numbers of times. On 25 November, 1905, I was at the shops, right near where the intestate was injured. It would not exceed fifty or sixty

feet from where I was to where the intestate was injured.    He
was between two of the cars standing on the shop lead track;
he was going toward East Spencer—east from the carpenter
shop.    The intestate was injured on track No. 8, called the
shop lead track.    Before he started to cross, going east, there
*was a string of cars on this track; they were there that morn-
ing as I went to work at 7 o'clock.    He was injured just a
litlle after 8 o'clock.    Between 7 o'clock and the time the
intestate was injured, the cars stood still.    If there was an
engine to the cars I did not see it.    An engine was finally
attached to the north end* of the string of cars.    The string
of cars stood across the opening; about four of the cars were
south of the opening.    The opening was shut up and impassa-
ble, unless you went between the cars or under them.    The
middle of the car was on the crossing (opening); cars were
attached to each end of that car.    The intestate was caught
between the cars about one-half car-length north of the open-
ing.    I suppose he went to the nearest place to go between the
cars.    The place where he was caught was fifteen or twenty
feet from the crossing (opening).    I saw where the cars were
when the engine was attached to them.    I was on track No. 9,
two car-lengths from where Grubb was hurt; it was about
sixty feet from where he was hurt.    I was about forty feet
nearer the engine than he was.    *I could not see the engine
when it was attached to the cars.*    It was down in the lower
(north) part of the yard, around a curve.    The tracks east
of the lead track, which run into the lead track, were filled
with cars; they went out to within a short distance of the lead
track.    They could not see the engine from their side.    It
was impossible for Grubb to see the engine from where he
stood.    I saw the cars he was caught between; one of them
had the drawhead out and they were chained together.    The
one farthest north had the drawhead and bumpers out.    It
was chained to car behind it.    There were *between two and
three feet between the cars* as they were chained together.

*The cars came together when the engine pushed cars back.*
Grubb was between two cars, passing over, and was caught.
The cars could not have come together if the car had had a
drawhead. They would have been about two feet apart.
*There was no flagman on the rear of the train before the cars
were shoved back together. There was no flagman or senti-
nel on the ground to give signals. There was no watchman
or sentinel at either of these openings or crossings. No sig-
nal was given, that I heard. If the bell of the engine had
been ringing as it was attached to the cars, it could have been
heard where Grubb was.*"

As this witness stated that this "string of cars" had been
on the track since 7 o'clock; that "if there was an engine to
the cars I did not see it"; and, further, "An engine was
*finally* attached to the north end of the string of cars"; that
"I (witness) was about forty feet nearer the engine than he
(the deceased) was"; that "I could not see the engine when
it was attached to the cars," it is an inference the jury might
have reasonably drawn (and is, therefore, to be considered
on a nonsuit) that this string of cars, which had been stand-
ing on the track since 7 o'clock, and to which he did not see
any engine, was a dead string of cars, and that the sudden
attachment of the engine and its being run back, without
notice or signal, was the *causa causans* of the death of plain-
tiff's intestate.

The plaintiff's intestate was a boy, working on the night
shift in the defendant's shops on the west side of these forty
tracks. His tour of work ended at 7 A. M. He then had
to return over these numerous tracks, as he lived on the east
side. He had to wash up, and possibly may have remained
to breakfast or for other purposes, so that it was after 8
o'clock when he started home across these tracks, as he and
others residing on the east side were accustomed to do. There
is no evidence that this delay made it any more dangerous
than if he had crossed sooner after 7 o'clock. He found a

string of "dead" cars standing still on one of the tracks, the rear car of which was exactly across his usual road home. Between the end of this car and a disabled car, attached to the rear car by a chain, there was an interval of several feet. The intestate attempted to pass through this interval. He thus went probably a third of one car's length out of the direct road (one witness says fifteen feet) to clear the car standing in the road. The string of cars was made up of "dead" cars, we take it, with no engine attached. The sudden attachment of the engine, which was done around a curve, so that the intestate did not see it attached, and the pushing back of the cars, without signal or anyone on the rear to give notice, it would seem, were the proximate cause, and not the conduct of the boy, who was getting across these numerous tracks in the best way he could, as he and so many others were daily required to do. If there was any contributory negligence, whether that or the negligence of the defendant was the proximate cause of the death of the boy was a matter which should be passed on by the jury, not by the court.

This renders it unnecessary to consider the other exceptions for exclusion of evidence. The judgment dismissing the action is set aside.

New Trial.

CONNOR, J., concurring: I concur in the opinion of the Court that this case should have gone to the jury. While there are some portions of the evidence not entirely clear, in respect to the several tracks and the different uses to which they were put, I think it appears with sufficient certainty that for ten years the custom had prevailed for the employees, who lived on either side of the system of tracks at Spencer, to pass under, over and between the cars in going to and returning from their homes. While some provision seems to have been made for walkways, it appears that they were usually, and on this occasion, blocked by cars standing on and

across them, and that the employees were accustomed to go under or between the cars. It was the duty of defendant to provide a sufficient number of safe and clear walkways for the use of its employees. If it was impracticable to keep them at all times open, guards should have been provided to protect persons passing under or between the cars, and to flag engines and see that no one was passing before they moved. In failing to make some safe way, thus endangering the lives of more than a thousand people whose duty and employment subjected them to danger, there was negligence, or, at least, evidence thereof fit for the consideration of the jury. I, of course, concede that ordinarily it is gross negligence to go between cars with an engine attached, and, in the absence of some satisfactory explanation, such conduct will bar a recovery; but the evidence here tends to show that the plaintiff's intestate, a young boy, in going between the cars, did as all others similarly situated, and that he was acting in accordance with a general custom which had existed for ten years. I do not think, under the circumstances, it can be said that, as a conclusion of law, he was negligent. The question is for the jury. I forbear discussing the evidence, for the reason that, as the case goes back for a new trial, other evidence may be produced. I would not care, with my limited knowledge and observation, to express an opinion in regard to the manner in which a safe way should be provided for the employees to pass over the tracks in the defendant's yard at Spencer. It is to be regretted that more attention is not given by both employer and employee to securing, in the largest practicable degree, the lives and limbs of employees in the service of railroads. Both humanity and interest demand that the danger to which men engaged in this useful and, in a large sense, public service shall be reduced to the lowest possible point. Necessarily, there are dangers incident to work upon a large train yard like this, but it would seem that, if hundreds of men are to continue to pass under, over and between cars in the dis-

charge of their duties, some precautionary method should be found to protect them from the danger of the cars being suddenly moved without warning.

WALKER, J., concurs in this opinion.

BROWN, J., dissenting: Being fully convinced that his Honor, *Judge Moore,* who tried this case below, committed no error in granting the motion to nonsuit, I feel it my duty to withhold my consent to the judgment of the majority in overruling him. As the facts are not fully stated in the opinion of the Court, I will state them by quoting from the testimony of plaintiff himself and his witnesses. The plaintiff's intestate was a tool boy, seventeen years of age, employed at night in defendant's shops at Spencer. He came off duty at 7 o'clock A. M., 25 November, 1905, and, a little after 8 o'clock, started across defendant's repair yards. Finding a train of crippled cars in his way, he attempted to climb over the connecting chains which fastened one car to another, and just then the engine backed, and he was crushed and killed.

The repair shops at Spencer, according to the map filed in the record, consist of a very long building, constructed parallel with the tracks laid through the yard. There are some thirty or forty railway tracks in front of this building, between it and East Spencer. There are two towns at Spencer—one on the east and one on the west side of the tracks—and they are called "East Spencer" and "West Spencer." The shops, as the long building and its appurtenant buildings are called, are between the two towns and on the west side of the tracks. There are 1,300 employees in the shops. About 500 of them live in East Spencer and 800 in West Spencer. The custom of those living in East Spencer is to cross the tracks at the nearest place, to get to the shops to work. The plaintiff testifies: "I have seen people, going to and coming from their work, cross these tracks in great numbers." He further says: "I know about where Grubb was injured. There is an opening leading from the carpenters' shop as far

as the shed goes.    There is a plank walkway that leads to the carpenters' shop; it is used by people to walk across and to roll hand cars across the tracks.    The opening runs north and south.    If cars are on the tracks across this opening, people have to climb over, or under, or through, or go around the cars."    In reference to this custom of crossing the yard tracks, another of plaintiff's witnesses testifies: "People crossed the yard at most any place where they got to it.    The car men crossed in front of the carpenter shop, and others at other places.    People who were not employed by defendant crossed the yard wherever they came to it.    I don't know what the plaintiff's intestate was doing there that morning.    The night men got off at 7 o'clock in the morning."    The witnesses all concur in the statement, overlooked in the majority opinion, that defendant has constructed a good plank walk all around the repair yard, for the use of its operatives, by which it is perfectly safe, although a very little farther in distance, to go from East Spencer to West Spencer, and to and from the shops.    The evidence also shows that the employees who live in East Spencer will not take the extra trouble to use this walk, but cross the yards at no particular place, but wherever they happen to come to them, regardless of walks or openings. Witness Rufty says: "It is a customary rule—and has been for a long time—for people who work for the defendant, also for employees of the defendant, to cross the tracks there. They go the nearest way to their work.    I suppose 200 people cross the tracks daily."    The same witness further says: "There is a perfectly safe way to go to the depot, and to cross, outside of the fence."    It seems that the railroad depot is in East Spencer.

1. As the entire evidence, as I shall attempt to show, presents a "bald case" of contributory negligence, it is unnecessary to discuss the alleged negligence of the defendant in not ringing the engine bell and in not having a man on the end of

146—30

the train or a guard at the crossing. The boy was not killed by the end of the train backing on him on the crossing, but by climbing in between two crippled cars of the train which were coupled together by chains, some four or five cars from the end, rather than walk the short distance around the rear of the train. Had a watchman been at the crossing he could have done no more than tell the intestate exactly what was before his eyes, viz., that a train of cars blocked the crossing and that it was dangerous to climb between them. The watchman was not required, nor had he the legal authority, to catch the intestate and hold him to prevent his crossing. The evidence shows that he was an intelligent, smart boy. He was not on duty at the time, nor going to or returning from his work, but, assuming that he was, I can see no reason why the defendant's other servants should have been on the lookout for him or been required to anticipate so dangerous an act. As to the custom of the employees to go to and from their homes by crossing the tracks wherever they came to them, I fail to see by what means the defendant can break it up or guard against injury, or any evidence that defendant assented to it. We should bear in mind that these tracks are not crossed by public crossings nor traversed by regularly passing trains. They are the multitudinous switch tracks of the defendant's repair yards. The crossings must necessarily be blocked by crippled cars and those cars just out of the shops, and when they are so blocked the employees can easily see it, and it is their plain duty to take the somewhat longer plank walk around the yard, provided by the company for just such conditions, and which is not intersected by these numerous but necessary tracks, and which is admittedly free from all danger. The evidence shows that the workmen do not cross the yard tracks at any particular places, but wherever they happen to come to them, and, as witness Rufty says, "They go the nearest way to their work." This is human nature, and others besides the plaintiff's intestate have unfortunately

come to grief by taking short cuts in order to save a few minutes time.    I do not see what the company could do to break up this imprudent habit of 500 employees, unless it could put each one under guard and force him to follow the "safe and narrow way" that leads to safety, and this it has no power to do.    Crossing the repair yard of a great railway system at any point, with its network of tracks and labyrinth of cars and engines, is a dangerous venture at best, and no one knows it better than its employees.    The trouble is, they become so habituated to their hazardous but necessary work that they become indifferent to danger and sometimes incur needless risks, which no one else would think of taking.    My observation is that railway men, as a class, are a very fine type of our race, gifted with as much good sense and natural prudence as most of us, but, from constant familiarity with danger, the best of men become inured to and careless of it.    The railway company cannot correct this tendency, and, under the ruling in this case, it has to pay for the consequences, however unable to prevent them.

2. The conduct of plaintiff's intestate, as proven by plaintiff's own witnesses, shows such a reckless disregard for his own safety that, under the well-settled principles of law, he ought not to recover on his own showing.    There are cases where the court must, as matter of law, declare that an act constitutes negligence.    When the facts are undisputed and lead to but one inference, the question whether there was or was not negligence is one of law.    This is such a case.    According to witness Ketchie, the plaintiff's intestate was injured on track No. 8, called the "shop lead track," while he was going east.    There was a string of cars on this track and some of the cars were across the opening, rendering it impassable, unless by going between, under or around the cars.    An engine was attached to the north end of the cars.    When the boy (Grubbs) came along he did not look for any opening and would not take the trouble to walk 100 feet around the

end of the train, which, all the evidence shows, he could easily have done, but, instead of doing what was so obviously his duty, with any sort of regard for his own safety, he went to the nearest place to go between the cars, without seeking to ascertain if an engine was attached to the train. Ketchie testifies: "I suppose he went to the nearest place to go between the cars. The place where he was caught was fifteen or twenty feet from the crossing (opening). I saw where the cars were when the engine was attached to them." Again, "The string of cars stood across the opening; about four of the cars were south of the opening." Ketchie further states that the yards and tracks were frequently crowded with cars about "quitting time," and "The employees had to cross the line of cars or take the longer route home by the plank walk."

There is a cinder path, made for the use of workmen, alongside of this "lead track," in crossing which Grubb was hurt, and in reference to which plaintiff, who was himself a workman at the shops, testifies: "I don't know whether the intestate was going in or coming out when he was hurt. It is not safe to cross the railroad anywhere. It would have been safer for Grubb to have walked down the cinder path than to have crawled between or climbed over the cars. There was a safer way for him to get out of the yard than to crawl between or under the cars. I don't know whether Grubb worked during the day or during the night. He was a tool carrier in the machine shop. There are two walkways; I don't know the distance apart. If the walkways were not blocked with cars, it would have been safer to go by them. People do go under and between the cars. It would have been safer to go around them." On redirect examination this witness testified as follows: "The opening that crosses the track is the width of the railroad tracks. There is a plank walkway there for people to walk on going to and from work, across the lead and other tracks. People use this." The intestate, being a workman, was fixed with knowledge of the dangers attending crossing

this lead track, especially, for Ketchie testifies: "They are constantly shifting cars on the lead track, and defendant will not allow cars to be flagged on the lead track. They flag cars on the other tracks to indicate that they are not to be moved." Again: "They run crippled cars in on the lead track for the purpose of shifting them to the other tracks to be repaired. They are usually loaded cars. The drawhead was pulled out of the car, and when the cars came together the drawhead on the other car went between the draft timbers of the crippled car and the cars came close together. Anyone could see that they would come close together. Grubb could see this." Again: "I suppose it would have been safer for Grubb to have crossed over the top of a car. It was not as dangerous to go over the top as between the cars." I quote these extracts from the testimony to show that it was perfectly obvious to the intestate that he was incurring an extra and extremely dangerous risk in attempting to cross between crippled cars, connected by chains only, without bumpers to keep them apart, and on a track where necessary shifting was constantly going on. He knowingly took his life in his hands when he did it, and rushed on danger with his eyes open. To show that Grubb had a perfectly safe way, which a rational being of ordinary prudence should have taken, I quote again from Ketchie: "There was a plank walk all around the yard. It would have been safer to go around the yard than through it. * * * Grubb would have had to walk 100 feet around this string of cars to have gone a perfectly safe way." Again: "If Grubb had gone to the rear (south) of the line of cars and around them, he would have had a perfectly safe way to go." Again: "If Grubb had gone around the rear of the string of cars, there were no cars between the sheds which he would have had to go between." Again, same witness reiterates, "There was a perfectly safe way for Grubb to have gone." The only witnesses examined in the case, except one character witness, were the witnesses whose testimony I have quoted from. The

defendant offered no evidence.    It is manifest that the plaintiff's intestate had two safe ways to get to his home—one by the plank walk leading around the end of the yard tracks, provided by defendant for his use and used by many workmen, and the other by taking the trouble to walk 100 feet around the south end of the train of cars then standing across the lead track.    At common law the master is required and impliedly agrees to provide reasonably safe premises and places in and about which the servant is required to work, and reasonably safe and suitable machinery and tools to work with, but it is equally well settled, as said by *Justice Connor* for this Court, unanimously, that, *"Where there is a safe and a dangerous method available for the performance of the work in hand, and the servant selects the latter method with actual knowledge of the fact that it is dangerous, he cannot recover."    Covington v. Furniture Co.,* 138 N. C., 378; *Horne v. Power Co.,* 141 N. C., 50.    And, as again said by the same learned Judge, "He should not have taken chances, in the presence of an obvious, apparent and well-known danger; if he did so, and was hurt, he cannot cast upon his employer the blame or responsibility."    *Elmore v. Railway,* 132 N. C., 865.    In *Whitson v. Wrenn,* 134 N. C., at p. 86, *Justice Walker* states the law to the same effect.    The master is, of course, required only to provide means and premises as reasonably safe as the nature of the employment will permit.    One who works in railroad shops, repairing yards or in a powder mill cannot be made as safe as he who clerks in a store or works on a farm. The evidence shows that the defendant met all the requirements, so far as providing a safe way of ingress and egress, which the intestate deliberately declined to use, but pursued a course of the most obvious danger.    It is said that such was the custom.    I answer that no reasonable person is ever justified in following a custom which is attended with such imminent danger to life and limb, and it ought not to protect him from the consequences of his own act.    It is a custom the

defendant cannot justly be said to countenance, because it had no means to stop it. And, again, there is no evidence that any other employee ever went between two crippled cars on this lead track which were chained together, without bumpers, the absence of such bumpers rendering him liable to be crushed in an instant; much less, that there is such a custom in vogue among all the servants of defendant. We have held that, where a servant chooses to do his work by a dangerous method, contrary to the directions of his master, the master is not liable for injury sustained, whether the danger be obvious or not. *Whitson v. Wrenn,* 134 N. C., 86. With how much greater force should that rule apply to a case like this, where the danger of the act stared the servant in the face. In a similar case to this, where the injured party passed between the cars of a train at the direction of a brakeman, the Supreme Court of Indiana declared it to be an act attended with such obvious and extreme danger as to bar a recovery. The Court says: "It will not avail the plaintiff that he was not fully aware of his danger, for a plaintiff is bound to know the extent of the danger in cases like this, where the hazard is apparent to a reasonably prudent man. A man must use his senses, and is not excused when he fails to discover the danger, if he has made no attempt to employ the faculties nature has given him." *Railroad v. Pinchin,* 112 Ind., 595. The principle is laid down in innumerable cases, with undeviating uniformity, that one who attempts to cross the track between the cars of a train which he either knows or might know by observation and use of his natural faculties is likely to move at any moment is guilty of such gross negligence (if not recklessness) that he cannot recover, if injured. *Railroad v. Pinchin, supra; Railroad v. Henderson,* 43 Pa. St., 449; *Railroad v. Kendrick,* 40 Mass., 374; Beach Cont. Neg., 40, 258. "It is a danger so immediate and so great that he must not incur it." *Ranch v. Lloyd,* 31 Pa. St., 358; *Railroad v. Copeland,* 61 Ala., 376; *Stilson v. Railroad,* 67 Mo., 671; *Lewis v. Rail-*

*road,* 38 Md., 588; *Haldan v. Railroad,* 30 U. C. C. P., 89.
The case of *Rumpel v. Railroad,* 22 L. R. A., 730, is so very
pertinent that I quote from the opinion: "There was nothing
to hinder the plaintiff passing around the cars at either end
at any time, except that it was inconvenient and took too much
time. He could have passed around the train by walking 100
to 185 yards and back. Plaintiff was an adult and in posses-
sion of all his faculties."

The Supreme Court of Georgia, in an opinion by that emi-
nent jurist, *Chief Justice Bleckley,* holds that, though a train
be an unauthorized obstruction of a public highway, a person
attempting to pass between the cars, if injured, is barred from
recovery. The Court says: "Nevertheless, instead of waiting
for the train to get out of the way, *or attempting to go around
it,* he voluntarily, and without warning anyone of his inten-
tion, exposed himself between the cars," etc.

In *Lewis v. Railroad, supra,* the Supreme Court of Mary-
land declares an act somewhat similar to the one we are con-
sidering "such a glaring act of carelessness as to amount in
law to contributory negligence."

It is urged that the train of cars had been backed across the
crossing, and, therefore, plaintiff's intestate was excusable for
his attempt to pass. We must remember that the crossing was
in the private switching yards of the depot and across the
main lead track, where switching was constantly going on, day
and night, so much so that "flagged cars," intended to remain
stationary for a while, were not allowed on that track. Under
such conditions, blocking the crossings is inevitable. But sup-
pose it had been a public crossing; the act of plaintiff's intes-
tate was unwarranted. In a case almost identical, the Su-
preme Court of Iowa says: "The actual use by a railroad
company of its tracks, so long as in use, is a suspension of the
right of the public to cross; and one injured in attempting to
cross during such occupancy cannot recover." *Wagner v.
Railroad,* 122 Iowa, 360.

In *Railroad v. Ryler,* 87 Ga., 491, the Supreme Court of that State says: "The placing of stationary cars in its yards, on the tracks where people are accustomed to pass, is notice to them not to attempt to pass while the cars remain, and, if a person undertakes to pass under the cars, he does it at his peril." Again: "In a railroad yard, in which there are several tracks in continuous use for the purpose of storing and switching cars and making up trains and the like, and where the dangerous character of the place is manifest and obvious, there can be no implied license to cross the tracks, either through open spaces casually left between the cars or under or above the cars."

In *Railroad v. Copeland,* 61 Ala., 376, *Chief Justice Stone* characterizes the attempt to pass between cars of a train coupled together as "negligence bordering on recklessness," which bars recovery for injuries received.

There are some discrepancies between the facts stated in the opinion and the record, as I read it, which I will note.

It is stated that the injury occurred "on one of these tracks known as the dead track." All the evidence shows it occurred on the lead track, a "live track," in constant use for switching, day and night, where no dead or flagged cars were allowed.

It is further stated that the first car which was chained to the string of cars was immediately over the crossing, which made it necessary for the intestate to pass between them. The testimony of Ketchie and the other witnesses distinctly declares that four cars were south of the crossing and all the others north of it, and that the intestate did not cross at the crossing, but twenty feet from it, and that, by walking 100 feet, he could easily have gone around the end of the train. It is said that no engine was attached to the cars, and that they were dead cars—that is, "flagged cars," forbidden to be moved. The evidence shows they were disabled loaded cars, recently run in the yards for repairs, with no flags on them, and on the lead or live track, in constant use, and that the engine was

attached, but around the curve and not visible to deceased. The ruling of this Court, that it was negligence to have no bumper or drawheads on these cars to keep them apart, on account of which plaintiff was crushed, entirely ignores the fact that the drawheads had recently pulled out and the cars were then brought in the yards for repairs. It is a proposition somewhat novel, to say the least, that the defendant is negligent for bringing its crippled cars, without drawheads, into its repair yards to have them replaced, and that, if the absence of drawheads causes injury to a workman on the yards, the company is liable. It is not contended that the engineer saw the deceased as he backed his engine, or that he could have seen him. The deceased attempted to cross at a place where he knew the engineer could not see him and where he could not see the engineer. He made no effort to ascertain whether an engine was attached to the train or not. Instead of looking to see, or waiting for the train to be moved, or going around it, he voluntarily, blindly and needlessly exposed himself between the cars, where the danger was open, visible and threatening, with full knowledge that the bumpers were gone and that the connecting chains could not keep the cars apart.

To sum up the matter, the undisputed evidence is that the injury occurred, not at a station where passengers were received or discharged, but in the shifting yard of defendant—a place filled with tracks and cars and a place not for visitors or the public, and on a track in constant and continuous use for shifting purposes. The track was also used to place crippled cars, so as to shift them to other tracks to be repaired, and cars were never allowed to be flagged on this track, showing that defendant intended this track to be open for constant use. A safe and secure way was provided to go from one side of the yard to the other. Cinder paths were on each side of the tracks; a plank walk had been built all the way around the yard, affording an absolutely safe passway for employees—a

fact entirely ignored in the opinion of the Court. In addition, by walking 100 feet around the end of the string of cars, deceased would have had a perfectly safe way to cross the yard; but, instead of taking a safe course, he attempted to cross between two cars chained together, where anyone could see that the least movement from either end of the train would cause the cars to come together and crush him. The dangerous character of the place was manifest and obvious to anyone.

The unwavering line of authorities declare such conduct to bar recovery for injury sustained.

As the majority of this Court think otherwise, it is to be regretted that no authority is cited to sustain their view.